UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA,

    *Plaintiff,*

v.                                                   Case. No. SA-20-CR-368-JKP

DYLAN JAMES RIVAS,

    *Defendant.*

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Dylan James Rivas' Motion to Suppress Evidence. ECF No. 62. The Government filed a Response (ECF No. 64), Rivas filed a Reply to the Response (ECF No. 65), and, on February 14, 2023, the Court held a hearing on the motion. The Court admitted all evidence submitted by the parties for the purpose of resolving the motion. For the reasons set forth below, the Court **DENIES** the motion.

### I. BACKGROUND

On April 14, 2020, Rivas allegedly pistol whipped his ex-girlfriend, sending her to the hospital with her injuries. Late that evening, when she returned home, he allegedly attacked again, firing several shots at her home before driving away. For the pistol whipping, Rivas was charged with aggravated assault with a deadly weapon, and he had a warrant out for his arrest.

Before he could be arrested on the warrant, Rivas allegedly went to visit a friend at her house on Bronte Street in San Antonio, at around 2:40 p.m. on April 17. While there, he allegedly instigated an altercation with another man and shot him in the leg. After the shooting, Rivas quickly left the Bronte house and traveled to the house of his friend, Jeremy Vargas, at 303 Otter Drive in

San Antonio. Meanwhile, SAPD Detective Joe Rios received a tip from another detective that Rivas was at 303 Otter. *See* ECF No. 64-1 (Detective Rios Report) at 3. Knowing Rivas had the active warrant for aggravated assault with a deadly weapon, Detective Rios and other officers established surveillance at the house. Soon after, they saw Rivas and Jeremy Vargas exit the house, enter a car, and drive to a nearby corner store. *Id*. Officers followed them to the store and arrested Rivas inside. *See* Detective Rios Body Camera Video at 0:15-0:40. Officers found $3,354 in Vargas' possession and found about 5 grams of methamphetamine inside the center console armrest of the car. *See* ECF No. 64-1 at 3.

Detective Rios interviewed Vargas, who stated that he lived at 303 Otter. *See* Bodycam Video at 2:40, 3:53. Based on this, Detective Rios decided to return to 303 Otter to do a knock and talk. *See* Bodycam Video at 6:30. When officers arrived, they found a man sitting in the passenger seat of a car in front of the house. *Id*. at 14:40. Officers also discovered that there was a handgun wedged between the driver's seat and the center console. *See* ECF No. 64-1 at 3. When questioned, the man stated that his friend, Rico Fernandez, had gone inside the house. *See* Bodycam Video at p. 15:00. Aware that Fernandez was inside with another individual, Jessica Valenzuela, Detective Rios knocked on the door, but nobody answered. *Id*. at 16:05.

Eventually, Fernandez exited the house out the back door. *Id*. at 22:25. Fernandez told officers that he had come to the house about an offer to look at a pistol. *Id*. at 22:45-23:15. Meanwhile, officers did a protective sweep of the house and observed a short-barrel rifle and marijuana in plain view. *See* ECF No. 64-1 at p. 3. By this time, Valenzuela had exited the house through the front door. *See* Bodycam Video at 23:20. Both she and Fernandez indicated that there was a gun in the house. Fernandez reiterated that he had come to the house to meet with Valenzuela and look at a Glock firearm, *id*. at 25:40, and Valenzuela explained that Rivas and Vargas had

2

guns in the house. *Id*. at 27:00. Because he believed that there were multiple firearms in the house, Detective Rios asked Valenzuela to show him where they were, and she agreed. *Id*. at 27:04. As they went inside, Detective Rios asked Valenzuela about the Glock, and she walked him to the kitchen. *Id*. at 27:35. When Detective Rios asked again about the Glock, Valenzuela told him to check in the drawers while gesturing towards the kitchen island. *Id*. at 27:42. Next, Valenzuela opened two drawers in the kitchen island. *Id*. at 28:00. The first, the rightmost drawer, only contained kitchen supplies, but the middle drawer contained a Glock firearm and a magazine, which Detective Rios directed Valenzuela to leave there. *See id*. at 28:08-28:12; ECF No. 64-2 (Photo of Glock Firearm in Middle Drawer). At this point, Detective Rios decided to obtain a search warrant for the house. *See* Bodycam Video at 28:30. Meanwhile, officers took Valenzuela to police headquarters for an interview with SAPD Detective Deanna Platt, who was investigating the shooting Rivas allegedly committed at the Bronte residence. *See* ECF No. 64-3 (303 Otter Search Warrant). Detective Rios prepared the affidavit for a search warrant. At the top of his affidavit, he listed 303 Otter as the place to be searched and listed that he expected that evidence of the offense of Prohibited Weapons—specifically, a short barrel firearm—would be in the residence. Then, in the probable cause section, Detective Rios summarized the above events, including Valenzuela's statement that "she was waiting for Rivas to return to sell a handgun that Fernandez was there to purchase." *See* ECF No. 64-3. Detective Rios then included additional information from Valenzuela's interview with Detective Platt; specifically: that Rivas had arrived at 303 Otter sometime after 3:00 p.m. and appeared very nervous; that he was anxiously pacing around the house and stated that he had to sell a handgun; and that he had asked Valenzuela to bring him bleach while he was showering. *See* ECF No. 64-3. Finally, Detective Rios requested "the search to retrieve what I believe to be evidence (firearm) used in the Aggravated Assault w/a

Deadly Weapon under case #SAPD20074457 and any other contraband in relations to weapons offenses." *Id*. After reviewing the affidavit, a Municipal Court Judge signed the warrant. The warrant expressly incorporated the affidavit for all purposes and authorized officers to search 303 Otter for the requested items, including, but not limited to, a short barrel firearm. *Id*.

Detective Rios and officers then searched the residence and seized a Glock, model 43X, 9mm caliber pistol from the kitchen drawer. A shell casings examiner later confirmed that this Glock was the same one used during the shootings at Rivas's ex-girlfriend's home and at the Bronte residence. Accordingly, Rivas, who has a previous aggravated robbery conviction, was charged as a felon in possession of a firearm. He now seeks to suppress the Glock seized from 303 Otter, arguing the search warrant was not supported by probable cause. Because Rivas lacks standing to challenge the search, the Court denies his request.

## II. BURDEN OF PROOF

The Fourth Amendment protects against unlawful searches and seizures by requiring law enforcement to obtain a warrant for arrest and search. U.S. Const. amend. IV. When a search is conducted without a warrant, the Government bears the burden to prove, by a preponderance of the evidence, the search qualified for an exception to the warrant requirement. *United States v. Ross*, 456 U.S. 798, 807–08 (1982). In some cases, when no exception applies, the Fourth Amendment carries a "judicially created remedy" allowing a defendant to suppress evidence obtained through an unreasonable search or seizure. *United States v. Leon*, 468 U.S. 897, 906 (1904); *Mapp v.Ohio*, 367 U.S. 643 (1961); *Weeks v. United States*, 232 U.S. 383 (1914). The so-called exclusionary rule "does not operate vicariously." *United States v. Beaudion*, 979 F.3d 1092, 1097 (5th Cir. 2020). Rather, a criminal defendant seeking suppression "has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or

seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1 (1978). Fourth Amendment standing, unlike Article III standing, is not a jurisdictional question, but is "more properly subsumed under substantive Fourth Amendment doctrine." *Id*. at 139. To establish standing, a defendant seeking to suppress evidence must show an unreasonable search or seizure "infringed [a Fourth Amendment] interest of the defendant" himself. *Id*. at 140.

A defendant can establish particularized interest in one of two ways. First, he may object to the "physical intrusion of a constitutionally protected area" in which he has a property interest. *United States v. Jones*, 565 U.S. 400, 407 (2012). Second, he may object to government action that violates a "reasonable expectation of privacy … in the place searched." *Byrd v. United States*, --- U.S. ---, 138 S. Ct. 1518, 1527 (2018). Either way, the Fourth Amendment standing inquiry is both defendant- and place-specific: it requires that a particular defendant have a property or privacy interest in a particular place. *See United States v. Hernandez*, 647 F.3d 216, 219 (5th Cir. 2011) (citing *Rakas*, 439 U.S. at 143).

### III.   DISCUSSION

In this case, Rivas argues he has standing to challenge the search of 303 Otter because he was a guest at his friend Vargas' home. Courts recognize residents and overnight guests as people who have standing to challenge the search of a residence. *See United States v. Scheffer*, 463 F.2d 567, 575 (5th Cir. 1972); *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990). However, overnight social guests are distinguished from temporary visitors. In the case of the latter, "one merely 'legitimately on the premises' represents the typical individual who may not claim" the protection of the Fourth Amendment. *United States v. Vega*, 221 F.3d 789, 798 (5th Cir. 2000) (quoting *Minnesota v. Carter*, 525 U.S. 83, 91 (1998)).

Rivas lacks Fourth Amendment standing because he had no privacy interest in 303 Otter. Counsel for Rivas could not confirm his home address; however, both parties agree Rivas does not live at 303 Otter. Vargas told police he is the sole resident of the house, which his mother owns. So, Rivas was not a resident of 303 Otter. Nor was he an overnight guest. The evidence supports the government's theory that, soon after shooting someone in the leg, Rivas arrived at 303 Otter, stashed his gun, and made plans to sell it. He then left to go to the store where he was promptly arrested. Rivas' temporary presence, amounting to a few hours at most, did not give him a legitimate expectation of privacy in the premises. Counsel for Rivas suggests Valenzuela's testimony that Rivas took a shower and asked for bleach while he was at 303 Otter is evidence he had a reasonable expectation of privacy in the home. But taking a shower at a friend's house, while unusual, is not sufficient to establish a person's privacy interest. Thus, Rivas lacks standing to challenge the search of 303 Otter and the seizure of the Glock pistol because "he was neither an owner nor occupant of the house, but merely a visitor." *United States v. Majors*, 328 F.3d 791, 795 (5th Cir. 2003). His motion to suppress is, therefore, denied.

## IV.   CONCLUSION

Because Rivas failed to meet his burden of establishing standing under the Fourth Amendment to challenge the search of 303 Otter, the Court **DENIES** his motion. ECF No. 62.

**It is so ORDERED.**
**SIGNED this 14th day of February, 2023.**

_____
JASON PULLIAM
UNITED STATES DISTRICT JUDGE